United States District Court
Southern District of Texas
**ENTERED**
August 28, 2024
Nathan Ochsner, Clerk

# In the United States District Court for the Southern District of Texas

## GALVESTON DIVISION

No. 3:24-cv-89

ALLAN ANDRES CEVALLOS SARZOSA, *PETITIONER,*

v.

CRYSTER DENNISSE VERGARA ENRIQUEZ, *RESPONDENT.*

## MEMORANDUM OPINION AND ORDER ENTERING FINDINGS OF FACT AND CONCLUSIONS OF LAW

JEFFREY VINCENT BROWN, *UNITED STATES DISTRICT JUDGE*:

This case arises under the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), T.I.A.S. No. 11670, as implemented by the International Child Abduction Remedies Act ("ICARA"), 102 Stat. 437, 22 U.S.C. §§ 9001-11. The Hague Convention seeks to address "the problem of international child abductions during domestic disputes," *Abbott v. Abbott*, 560 U.S. 1, 8 (2010), and its chief objective is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State." Hague Convention Art. 1.

The petitioner, Allan Andres Cevallos Sarzosa, contends that his daughter, KACV,[1] was wrongfully removed from Ecuador and withheld in the United States by her mother, the respondent, Cryster Dennisse Vergara Enriquez. Dkt. 1. On August 14, 2024, the court conducted an 11-hour final hearing on the petition.

After careful consideration of the record, including the admitted exhibits and the testimony the witnesses, the parties' arguments, and the applicable law, the court submits the following findings of fact and conclusions of law under Fed. R. Civ. P. 52(a).[2] For the reasons stated below, the court **DENIES** the petition for return.

## I.   Procedural Background

Mr. Cevallos filed this case on March 28, 2024. Dkt. 1. The court ordered a show-cause hearing to take place April 17. Dkt. 6. By agreement of the parties at the show-cause hearing, a final hearing was then set for May 22, but was later reset for June 27. Minute Entry 04/17/2024, Dkt. 19.

At the outset of the June 27 final hearing, a conflict developed between Ms. Vergara and her counsel. While mindful of the Hague Convention's call

---

[1] Pursuant to Federal Rule of Civil Procedure 5.2, the child's name has been redacted in all filings before the court. The initials KACV are used in lieu of her full name.

[2] Any findings of fact that are also, or only, conclusions of law are so deemed. Any conclusions of law that are also, or only, findings of fact are so deemed.

for swift action, the court reset the hearing to permit Ms. Vergara to seek new counsel. Minute Entry 06/27/2024. Ms. Vergara then moved for court-appointed counsel. Dkt. 29. In light of the numerous factual disputes and the gravity of the remedy the petitioner sought, the court granted the motion and appointed *pro bono* counsel for Ms. Vergara. Dkt. 30. The court then held a final evidentiary hearing on August 14, 2024. Except for Ms. Vergara and her retained expert,[3] all witnesses testified in Spanish remotely from Ecuador through interpreters present in the courtroom. Ms. Vergara testified in person through an interpreter. Her expert testified remotely, but in English.

## II.   Findings of Fact

Each parent's narrative of the relevant events differs substantially from the other's, and the court found neither to be completely credible. Piecing together all the evidence, and assigning each piece of evidence the credibility it deserves, the court finds as follows:

### A.   Background Facts

1.   Mr. Cevallos and Ms. Vergara are the biological parents of KACV.

---

[3] Mr. Cevallos objected to the court hearing Ms. Vergara's expert's testimony and moved to strike her designation. The court heard the expert's testimony, but it ultimately played no role in the court's decision.

2.     The couple was involved in an on-again, off-again dating relationship for several years. They were never married. They are both citizens of Ecuador.

3.     Mr. Cevallos works as an administrator for a private security company in Ecuador.

4.     Ms. Vergara previously operated a family-owned restaurant in Ecuador with two locations. While she lived in Ecuador, Ms. Vergara operated one location; her father operated the other.

5.     Mr. Cevallos is married to Lanie Espinosa and has two other children by her. Mr. Cevallos, Ms. Espinosa, and their two children live in Ecuador.

**B.     September 2021–July 2022: Ms. Vergara moves to the United States**

6.     In September of 2021, after a years-long process, Ms. Vergara was awarded status as a lawful permanent resident of the United States and received a green card. Mr. Cevallos was aware that Ms. Vergara had applied for a green card and did not object to her application.

7.     Ms. Vergara learned she was pregnant with KACV around the same time she received her green card.

8.     In preparation for her move to the United States, Ms. Vergara closed her location of the family-owned restaurant. Her father continued to operate the other location.

9.     In February 2022, Ms. Vergara moved to the United States. After briefly living with family in Georgia, she moved to New Jersey.

10.     In the spring of 2022, Ms. Vergara prepared to have her baby in New Jersey. She moved into an apartment, applied for and received Medicaid, and purchased a crib, a stroller, and a used car.

11.     KACV was born in New Jersey on May 18, 2022.

12.     Mr. Cevallos was working in Ecuador and was not present for the birth. He traveled to New Jersey to meet KACV a few weeks later. He sent between $2,000–$3,000 per month to Ms. Vergara after the baby was born.

13.     Ms. Vergara and KACV lived together in an apartment in New Jersey following the birth. KACV made regular visits to a pediatrician in New Jersey. Ms. Vergara credibly testified that she always intended to live permanently in the United States with KACV.

**C.     July 2022–December 2022: Ms. Vergara & KACV travel to Ecuador**

14.     Ms. Vergara and KACV traveled to Ecuador on July 31, 2022. KACV was about two months old.

15.    Ms. Vergara and KACV first moved into a short-term rental paid for by Mr. Cevallos. About a month later, the pair then moved into a leased home, also paid for by Mr. Cevallos.

16.    Initially, Ms. Vergara intended to remain in Ecuador for three months, and then return to New Jersey in October so that KACV could receive a battery of scheduled vaccinations. Dkt. 61-10 at 2. But Ms. Vergara altered her plans and intended to remain in Ecuador with KACV until December or January.

17.    While in Ecuador, KACV saw both Mr. Cevallos and her paternal grandmother, Rosa Cevallos, almost daily. KACV also received care from a full-time nanny, Mariuxi Jurado.

18.    In December 2022, Mr. Cevallos, Ms. Vergara, and KACV traveled together to New York City. The trio then returned to Ecuador for Christmas.

### D.    January 2023–June 2023: Ms. Vergara & KACV remain in Ecuador under coercion

19.    In January 2023, Mr. Cevallos placed both Ms. Vergara's green card and KACV's passport in his office without Ms. Vergara's knowledge.

20.    After Ms. Vergara learned that Mr. Cevallos had taken the documents, she demanded they be returned. Mr. Cevallos refused.

21.    On January 27, 2023, Ms. Vergara traveled to and entered Mr. Cevallos's office to retrieve the documents. When building security realized she was in the office without Mr. Cevallos's permission, Ms. Vergara threw the documents out of the office window to a waiting friend. The pair then drove away and were pursued by building security. After being chased for several miles by car, the security agents intentionally rammed their vehicle into Ms. Vergara's and retrieved the documents. Dkt. 61-6 (photos of damage to Ms. Vergara's car).

22.    Also in January of 2023, Mr. Cevallos registered KACV as a citizen of Ecuador without the knowledge or permission of Ms. Vergara.[4]

23.    Apart from a five-day vacation with Mr. Cevallos to Cancun, KACV and Ms. Vergara remained in Ecuador from January 2023–June 2023.

_____

[4] Under Ecuadorian law, persons born abroad to a mother or father born in Ecuador are automatically Ecuadorian citizens at birth. CONSTITUCIÓN POLÍTICA DE LA REPÚBLICA DEL ECUADOR 2008, ch. 2, art. 7. However, Ecuadorian children born abroad must be registered in order to exercise their rights as citizens. *See* ACTS OF CIVIL STATUS: BIRTH REGISTRATION, Embassy of Ecuador in the Kingdom of the Netherlands (last visited Aug. 26, 2024), http://www.embassyecuador.eu/site/index.php/en/actos-de-estado-civil?showall=1&limitstart=; Dkt. 64 at 144:15–145:9.

### E.    June 2023: The family's trip to Florida and removal of KACV

24.    In June 2023, Mr. Cevallos, Ms. Vergara, and KACV traveled to Florida.

25.    Mr. Cevallos, Ms. Vergara, and KACV had confirmed tickets for a return flight from Miami to Ecuador on June 17, 2023. But an argument erupted between Mr. Cevallos and Ms. Vergara at the airport, and police were compelled to intervene. According to the police report, Ms. Vergara maintained that she wished to remain with KACV in the United States while Mr. Cevallos wished for the trio to return to Ecuador. Dkt. 36-10.

26.    Mr. Cevallos feared that pursuing legal action at the airport could result in the state taking temporary custody of KACV. He decided to fly back to Ecuador as scheduled. Ms. Vergara then flew to Galveston with KACV the next day to live with a friend.

27.    KACV has remained in Galveston since June 18, 2023.

## III.   Conclusions of Law

### A.    The Hague Convention and ICARA

The Hague Convention seeks to "address the problem of international child abductions during domestic disputes." *Monasky v. Taglieri*, 589 U.S. 68, 71 (2020) (internal quotation marks omitted). The United States and Ecuador are both signatories to the Hague Convention. ICARA establishes

the obligations of the United States under the Hague Convention. 22 U.S.C. §§ 9001 *et seq.*

The Hague Convention "requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides." *Monasky*, 589 U.S. at 72. To show that the removal of a child was wrongful under the Hague Convention, the petitioner must prove by a preponderance of the evidence that: (1) the child was retained somewhere other than the child's habitual residence; (2) the retention was in breach of the petitioner's rights of custody under the laws of the country of habitual residence; and (3) the petitioner was exercising those rights at the time of retention. Hague Convention arts. 3, 12. But even if the removal was wrongful, "a court may still deny a petition if the respondent proves one of several narrow affirmative defenses to wrongful removal or retention." *Delgado v. Osuna*, 837 F.3d 571, 577 (5th Cir. 2016).

The petitioner must establish each of the three elements for wrongful removal by a preponderance of the evidence. *Id.*

## B.   Habitual Residence

"Determination of 'habitual residence' is perhaps the most important inquiry under the Convention." *Murphy v. Sloan*, 764 F.3d 1144, 1150 (9th Cir. 2014) (internal quotation omitted). The Supreme Court has held that

"the place where a child is at home at the time of removal or retention, ranks as the child's habitual residence." *Monasky*, 589 U.S. at 77. But determining where a child is "at home" is, in many cases, no easy task. A trial court is charged with conducting "a fact-driven and case-specific examination into where the child is at home, at the time of removal." *Morales v. Sarmiento*, 2023 WL 3886075, at *8 (S.D. Tex. June 8, 2023). No single fact is dispositive. *Monasky*, 589 U.S. at 78.

Mr. Cevallos offers an appealingly simple position as to KACV's habitual residence. KACV was born in the United States, moved to Ecuador as soon as both she and Ms. Vergara were healthy enough to travel, and remained there until the time of removal. As KACV lived in Ecuador for 11 of the first 13 months of her life, Mr. Cevallos argues, Ecuador was her home, and there could be "no other place . . . that could have constituted a habitual residence." Dkt. 25 at 5.

Ms. Vergara's position is, in many respects, more complicated. She contends that KACV's habitual residence was, and has always been, the United States. Ms. Vergara contends: (1) KACV was clearly "at home" in the United States during the first months of her life; (2) KACV visited Ecuador for a specific, limited period from July 2022–December 2022; and (3) KACV

and her mother were then effectively coerced to remain in Ecuador—against her mother's will—from January 2023–June 2023.

The parties' positions bring two preliminary issues to the forefront of the habitual-residence analysis: (1) whether KACV was initially "at home" in the United States, and (2) whether Ms. Vergara, and by extension KACV, were coerced to live in Ecuador beginning in January 2023.

### 1.   KACV was "at home" in the United States as of July 2022.

Ms. Vergara contends that the correct framing of the habitual-residence inquiry is whether KACV's habitual residence *changed* from her "original roots in the United States." Dkt. 36 at 10. Indeed, "[w]here there is no dispute as to what the child's country of habitual residence was as of a certain date, it is appropriate for the court to reframe the question in terms of whether the country of habitual residence *changed* after that date." *Rodriguez v. Lujan Fernandez*, 500 F. Supp. 3d 674, 702 (M.D. Tenn. 2020). Therefore, it is relevant for the court to consider whether KACV was initially "at home" in the United States prior to her time in Ecuador.

The evidence clearly demonstrates that KACV's habitual residence as of July 2022 was the United States. Ms. Vergara's time in New Jersey was marked with all the trappings of a mother preparing to welcome a child into a permanent home. She obtained a green card, moved to a new apartment,

applied for and received Medicaid, regularly visited a local physician, and purchased a stroller and a crib. Ms. Vergara also abandoned, to a large degree, her life in Ecuador. She closed her restaurant, sold personal belongings, and moved out of her apartment. Mr. Cevallos presents no credible evidence, beyond his own testimony, that Ms. Vergara's trip to the United States was anything but permanent.

During the first two months of KACV's life, Ms. Vergara clearly intended to remain in the United States and raise her child there. KACV was "at home" in the United States as of July 2022.

### 2. Ms. Vergara was coerced to remain in Ecuador from January 2023–June 2023.

Jumping ahead in time, it is also pertinent for the court to consider whether Ms. Vergara, and by extension KACV, were coerced to remain in Ecuador.

"Habitual residence is not established when the removing spouse is coerced involuntarily to move to or remain in another country." *Loftis v. Loftis*, 67 F. Supp. 3d 798, 808 (S.D. Tex. 2014). The Supreme Court has specifically instructed that evidence that "an infant lived in a country only because a caregiving parent had been coerced into remaining there" should "figure in the calculus." *Monasky*, 589 U.S. at 78. It certainly does so here.

The preponderance of the evidence shows that Ms. Vergara, and by extension KACV, were coerced to remain in Ecuador from January 2023–June 2023. First, the record strongly suggests that Mr. Cevallos stole and subsequently hid Ms. Vergara's green card and KACV's passport in his office. While Mr. Cevallos contends that Ms. Vergara consented to the documents being stored in a "safe place" at his office, the fact that Ms. Vergara felt she had to scheme to steal them back undercuts this assertion. Mr. Cevallos does not contest that on January 27, 2023, Ms. Vergara: (1) entered his office without permission; (2) threw the travel documents out the window when discovered by security; and (3) fled Mr. Cevallos's security agents in a miles-long car chase. It defies reason that Ms. Vergara would engage in such high-risk behavior if she had consented for her travel documents to be safely stored in the office. *See* Dkt. 61-6 (photos of damage to Ms. Vergara's car).

Second, Mr. Cevallos (1) obtained an apostille[5] on KACV's birth certificate and (2) registered KACV as an Ecuadorian citizen without Ms. Vergara's consent. *See* Dkt. 63-7 (Ecuadorian birth registry dated January 19, 2023, containing signature of Mr. Cevallos, but not Ms. Vergara). These

---

[5] An "apostille" is a "standard legal certificate attesting that the signatures, seals, or stamps are authentic on a public document used in a foreign country." Black's Law Dictionary (12th ed. 2024).

two acts, both discretely executed, meant that Mr. Cevallos's consent would be required for KACV to leave Ecuador.[6]

The fact that Mr. Cevallos withheld Ms. Vergara's and KACV's travel documents and secretly took action to prevent Ms. Vergara from unilaterally leaving Ecuador with KACV, together with court's assessment of Ms. Vergara's credibility, leads the court to conclude that Ms. Vergara was coerced to remain in Ecuador from January 2023–June 2023. *See In re Application of Ponath*, 829 F. Supp. 363, 367 (D. Utah 1993) (finding no change in habitual residence when a short-term trip was extended by means of coercion); *Morales*, 2023 WL 3886075, at *8 ("[C]oercion can undermine shared intent to settle in a country.").

### 3. KACV's time in Ecuador from July 2022–December 2022 was insufficient to change her habitual residence.

Having addressed the two preliminary issues, one question remains for the court: Was KACV's presence in Ecuador from July 2022 to December 2022 sufficient to *change* her habitual residence from the United States to Ecuador?

---

[6] Under Ecuadorian law, both parents must consent before their child can travel outside the country. Ecuadorian Code of Childhood and Adolescence ("ECCA") 109. *See also Vera Revelo v. Canizalez Cedeno*, 625 F. Supp. 3d 529, 538 (W.D. La. 2022) (analyzing ECCA); Dkt. 64 at 85:6–85:8 ("Our law establishes that no minor can travel without the consent of their parents.").

This inquiry requires analysis of "a wide range of facts" to "determine whether an infant's residence in [the new country] has the quality of being 'habitual.'" *Monasky,* 589 U.S. at 81. While the Supreme Court has made clear that an actual agreement between the parents is not required, the analysis may properly begin with evidence of the parents' shared intent. *See Gallegos v. Garcia Soto*, 2020 WL 2086554, at *3 (W.D. Tex. Apr. 30, 2020) (noting that *Monasky* complemented existing Fifth Circuit precedent, which called for fact-intensive analysis, beginning with the parents' shared intent); *Smith v. Smith*, 976 F.3d 558, 563 (5th Cir. 2020) (approving of district court analysis which began with the parents' shared intent before moving on to a fact-intensive determination).

The evidence does not suggest a firm, shared intent between the parents for KACV to permanently abandon her home in the United States to live in Ecuador. Nor does the evidence suggest a clear shared intent for KACV to visit Ecuador merely for a "specific, delimited period." Dkt. 36 at 10. Rather, this case falls into a difficult category of "in between" cases in which the child travels abroad "for some period of ambiguous duration." *Mozes v. Mozes*, 239 F.3d 1067, 1077 (9th Cir. 2001). In such cases, where the "exact length of the stay [is] left open to negotiation," discerning the intent of the parties can prove especially difficult. *Id.*; *Berezowsky v. Ojeda*, 765 F.3d 456,

467 (5th Cir. 2014) ("The mere fact that the parents have consented for the child to move to a new country does not prove that they share the necessary intent to make that new location the child's habitual residence.").

In such "ambiguous duration" cases, courts seek to determine whether the child would perceive her "stay in [the new country] to be merely a temporary journey" or, instead, would perceive a "settled purpose to leave" the prior country and make a new home. *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006). The answer to this inquiry is not necessarily time-dependent. "The concept of 'settled purpose'" does not "require an intention to stay indefinitely, and may in fact be for a limited period, precipitated by various motivations." *Blackledge v. Blackledge*, 866 F.3d 169, 180 (3d Cir. 2017) (cleaned up). At bottom, "[a]ll that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled." *Id.*

Reviewing the evidence, nearly every facet of KACV's time in Ecuador straddles the line between "temporary journey" and "settled purpose."

- o **Communication of Intent:** In June 2022, the couple began planning, via text message, for Ms. Vergara to visit Ecuador. Dkt. 61-10 at 2. She originally texted that she would "stay for a couple of months" but needed to "be back by October because [KACV's]

next vaccines are scheduled for October 27." *Id.* Yet just one month later, as the couple was weighing the benefits of renting a furnished apartment for Ms. Vergara and KACV in Ecuador, Ms. Vergara suggested initially "renting a furnished one" and then "*after a year* change [to unfurnished] and buy things little by little." Dkt. 62-1 at 59 (emphasis added). No other text messages reveal a firm plan for the length of KACV's stay in Ecuador.[7]

o **Living Arrangement:** KACV first lived in an AirBNB in Ecuador, suggesting a finite stay. But she then moved to a rental home with a one-year lease, suggesting an intent to settle in Ecuador.

---

[7] After the final hearing, the court granted Mr. Cevallos's motion to admit a post-trial exhibit: a forensic analysis of his cell phone which he contends proves that the text messages Ms. Vergara offered into evidence, Dkt. 61-10, are "patently false." Dkt. 64 at 9:3; *see also Id.* at 42:9–16 (Mr. Cevallos testifies the messages are "absolutely false. Forged. Manipulated."). The court is not so convinced. Ms. Vergara's WhatsApp messages in Dkt. 61-10 are dated June of 2022. The forensic report, which allegedly disproves the veracity of these messages, searched for messages beginning in *July* of 2022. Dkt. 62-1 at 12, 17. The forensic report alone does not disprove the authenticity of the messages in Dkt. 61-10. Nevertheless, as neither party presented a complete message history of the parties' critical conversations in the summer of 2022, this factor is given little weight by the court. The court also notes that though it admitted the forensic analysis, its trustworthiness remains dubious as it had no sponsoring witness and is, the court acknowledges, hearsay. In the final hearing, trusting its own ability to assign each piece of evidence the weight it deserved, the court admitted exhibits it likely would not have admitted in a jury trial.

o **Familial Ties**: While in Ecuador, KACV saw her father, Mr. Cevallos, and maternal grandmother, Rosa Cevallos, almost daily, suggesting settled purpose. Yet, there is no evidence that Ms. Vergara's family in the United States said their goodbyes to KACV, or to Ms. Vergara, suggesting the family anticipated their return, especially in light of Ms. Vergara's permanent-resident status and KACV's status as a native U.S. citizen.

o **Personal Belongings**: Before her trip to Ecuador, Ms. Vergara sold her car in the United States, suggesting a permanent move. But she did not sell her stroller, car seat, and other baby items, suggesting a temporary journey.

o **Pediatrician Visits**: KACV had a doctor's appointment to receive her pediatric vaccinations from a physician in the United States, suggesting a "temporary journey" with a finite end-date. Yet KACV missed this appointment and ultimately received her vaccinations in Ecuador instead.

At best, the evidence to support Mr. Cevallos's position that the parties developed a shared intent to remain in Ecuador is a mixed bag. This is not enough. "Absent the parents' shared intent, prior habitual residence should be deemed supplanted only where the objective facts point *unequivocally* to

this conclusion." *Cartes v. Phillips*, 865 F.3d 277, 283 (5th Cir. 2017) (internal quotations and citation omitted) (emphasis added); *see also Papakosmas v. Papakosmas*, 483 F.3d 617, 626 (9th Cir. 2007) ("[I]n the absence of settled parental intent, courts should be slow to infer from such contacts [in the new country] that an earlier habitual residence has been abandoned.") (internal citation and quotation marks omitted).

Turning to the perspective of KACV, courts have considered "academic activities," "social engagements," "participation in sports programs and excursions," "meaningful connections with the people and places in the child's new country," "language proficiency," and "location of personal belongings" to determine a child's acclimatization to a new country. *Monasky*, 589 U.S. at 78 n.3. But KACV's tender age renders these considerations largely moot. As the Ninth Circuit has emphasized, it would be "practically impossible" for "a newborn child, who is entirely dependent on its parents, to acclimatize independent of the immediate home environment of the parents." *Holder v. Holder*, 392 F.3d 1009, 1023 (9th Cir. 2004). KACV was between two and eight months old during the operative period. As she will have little-to-no memory of this period, the court will give little weight to KACV's acclimatization, or lack thereof, to life in Ecuador.

Finally, KACV has strong familial ties to both the United States and Ecuador. While all of Mr. Cevallos's family lives in Ecuador, the vast majority of Ms. Vergara's family lives in the United States. Although KACV undoubtedly formed a bond with her paternal grandparents while in Ecuador, her family is found both in the United States and Ecuador.

In sum, KACV's habitual residence was the United States as of July 2022, and the preponderance of the evidence does not conclusively prove it changed to Ecuador. Although KACV lived in Ecuador for an indefinite duration, the evidence does not show the trip was for the "settled purpose" of permanently relocating KACV to Ecuador. And, given KACV's tender age, her time spent in Ecuador did not acclimatize her to such a degree that she was unequivocally "at home" there. Absent sufficient evidence to the contrary, the court concludes KACV's habitual residence was, and remains, the United States.

Mr. Cevallos has failed to meet his burden to show that KACV's habitual residence was Ecuador at the time of removal. As Mr. Cevallos has failed to establish the first element of his prima facie case, the court will not address the remaining elements or affirmative defenses presented. *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 271 (3d Cir. 2007) ("[I]f we hold that the United States was [the child's] habitual residence [on the date of

retention], the analysis is complete as the Hague Convention would not apply because her retention in the United States would not be wrongful as defined by Article 3.").

\* \* \*

As several courts have previously observed, "[t]hese cases are always heart-wrenching, and there is inevitably one party who is crushed by the outcome." *Holder,* 392 F.3d at 1023. The court's task in this case is narrow. It does not have the power to address custody, comment on the best interest of the child, or resolve all disputes between the parties. Rather, the court's narrow task is to determine whether KACV was wrongfully removed from her country of habitual residence. Based on the reasoning above, the court has determined she was not. The petition for return is denied. Dkt. 1.

SIGNED on Galveston Island this 28th day of August, 2024.

JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE